## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| MANU KENNEDY, ) | |
| 10647 Tranquil Glade Lane, ) | |
| Las Vegas, NV 89135, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No._____ |
| ) | |
| HON. VINCENT GRAY, ) | |
| In his official capacity as MAYOR ) | |
| DISTRICT OF COLUMBIA ) | |
| ) | |
|     Serve: ) | |
|     Tonia Robinson ) | |
|     441 4th St., NW, 630 South ) | |
|     Washington, DC 20001 ) | |
| ) | JURY DEMANDED |
| KENNETH B. ELLERBE, ) | |
| in his official capacity as ) | |
| Chief of DISTRICT OF COLUMBIA ) | |
| FIRE AND EMS DEPARTMENT (DCFEMS) ) | |
| 1923 Vermont Ave. NW, ) | |
| Washington, DC 20001 ) | |
| ) | |
|     Serve: ) | |
|     Kenneth B. Ellerbe ) | |
|     1923 Vermont Ave. NW ) | |
|     Washington, DC 20001 ) | |
| ) | |
| IRVIN B. NATHAN, in his official capacity as ) | |
| Attorney General, DISTRICT OF COLUMBIA ) | |
| 441 4th St. NW, 630 South ) | |
| Washington, DC 20001 ) | |
| ) | |
|     Serve: ) | |
|     Irvin B. Nathan, Attorney General ) | |
|     441 4th St. NW, 630 South ) | |
|     Washington, DC 20001 ) | |
| ) | |
| ) | |
| CITY OF DISTRICT OF COLUMBIA ) | |

**Serve:** )
**Tonia Robinson** )
**441 4th St., NW, 630 South** )
**Washington, DC 20001** )
 )
 )
**DC FIRE & EMS DEPARTMENT** )
**1923 Vermont Ave., NW** )
**Washington, DC 20001** )
 )
**Serve:** )
**Kenneth B. Ellerbe** )
**1923 Vermont Ave. NW** )
**Washington, DC 20001** )
**Defendants.** )
_____)

## COMPLAINT FOR DECLARATORY, INJUNCTIVE
## AND MONETARY RELIEF AND JURY DEMAND

1. This is an action for declaratory, injunctive, and monetary relief, based on discrimination in the workplace due to Plaintiff's disability and reprisal for requesting a reasonable accommodation, in violation of the Americans With Disabilities Act and Americans with Disabilities Act Amendments Act, 42 U.S.C. § 12101, *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. 1983, *et seq.*, and the District of Columbia Human Rights Act of 1977, D.C. CODE § 2-1401, *et. seq.*, and due to Plaintiff's race and in retaliation for engaging in protected activity, in violation of his rights under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §1981, *et seq.*, Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. 1983, *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the District of Columbia Human Rights Act of 1977, D.C. CODE § 2-1401-1402, *et. seq.*

2. After serving in the military reserves, Mr. Kennedy joined the District of Columbia's Fire Department in 2002.  He wanted to serve his community by becoming a firefighter, and

later a fire inspector.   In 2001, prior to Mr. Kennedy joining the Department, the Department implemented a grooming policy that prohibited firefighters from having beards.  However, the courts almost immediately enjoined the Department from enforcing this policy.  For years, the Department complied with the injunction.  In 2005, however, it effectively violated the injunction and issued a separate "safety policy," ordering that employees who wore tightfitting facepieces, such as firefighters, were not permitted to have facial hair.  The policy further stated that firefighters would be required to shave and undergo a "Fit Test," to ensure the seal between their faces and the face masks was secure.  The District Court for the District of Columbia once again entered an injunction, prohibiting the Department from enforcing the policy against individuals who maintained beards based on religious beliefs.

Mr. Kennedy served in his position without incident until 2008.  In 2008, as a result of his medical condition, pseudofolliculitis barbae, Mr. Kennedy was experiencing painful irritation from shaving.  To treat the condition and prevent future irritation, his dermatologist instructed him to maintain 1/8 of an inch of facial hair.  Mr. Kennedy informed the Department of his condition, provided medical documentation regarding the diagnosis and treatment, and even submitted to examination by the Department's own doctors.  While still maintaining 1/8 of an inch of facial hair, Mr. Kennedy took and passed the Department mandated Fit Test.  However, despite the clear medical directive that Mr. Kennedy must refrain from shaving due to his condition, and despite Mr. Kennedy passing the Fit Test, thereby demonstrating that he could safely wear the required face mask, the Department continued to order Mr. Kennedy to shave, in violation of his doctor's orders and despite the risk to his health.  When Mr. Kennedy

complied with his doctor's orders and maintained 1/8 of an inch of facial hair, the Department subjected him to continuous discipline in the form of suspensions and assignments to limited duty.  The Department subjected him to this discrimination despite being instructed twice by the Court that the policy was unenforceable against individuals maintaining beards for religious reasons.  Clearly, if these individuals could continue performing their duties while maintaining a beard for religious reasons, Mr. Kennedy could have continued performing his duties while maintaining 1/8 of an inch of facial hair for medical reasons.  Instead, the Department subjected him to a campaign of discrimination and reprisal.

The Department also had no concern for the fact that pseudofolliculitis barbae is a disease that affects almost exclusively black men.  The Department not only continued to fail to accommodate, and discriminate and retaliate against Mr. Kennedy, but it also continued to enforce a policy that has a discriminatory, disparate impact on black male firefighters.  As a result of the Department's discriminatory and retaliatory actions, Mr. Kennedy became disillusioned with the Department and ultimately let go of his goal of serving his community as a firefighter, resigning from his position with the Department.

## JURISDICTION

3. This Court has jurisdiction over Mr. Kennedy's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this matter contains a federal question.

## VENUE

4. From on or around September 9, 2002 until on or around May 3, 2013, Mr. Kennedy was employed by the District of Columbia Fire and EMS Department, which is located in Washington, DC.  Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and (2),

as the Defendant resides in the District of Columbia, and the events or omissions giving rise to Mr. Kennedy's claims occurred in the District of Columbia.

## PARTIES

5. Mr. Kennedy, Plaintiff, is currently an adult resident of Las Vegas, NV. At all times relevant to the complaint, Mr. Kennedy was an adult resident of the District of Columbia and was a person and employee within the meaning and protections of 42 U.S.C. § 12101, *et seq.*, 29 U.S.C. § 701 *et seq.*, 42 U.S.C. 1983, *et seq.*, 42 U.S.C. §1981, *et seq.*, 42 U.S.C. § 2000e, *et seq.*, and D.C. CODE § 2-1401, *et seq.*

6. Defendant, District of Columbia, operates District of Columbia Fire and EMS ("DCFEMS") and is capable of being sued under 42 U.S.C. § 12101, *et seq.*, 29 U.S.C. § 701 *et seq.*, 42 U.S.C. 1983, *et seq.*, 42 U.S.C. §1981, *et seq.*, 42 U.S.C. § 2000e, *et seq.*, and D.C. CODE § 2-1401, *et seq.* Irvin B. Nathan is named as Defendant in his official capacity as the Attorney General for the District of Columbia. Defendant, DCFEMS, is the Fire and EMS Department serving the District of Columbia, and was, at all times relevant to this Complaint, an employer, falling within the purview of 42 U.S.C. § 12101, *et seq.*, 29 U.S.C. § 701 *et seq.*, 42 U.S.C. 1983, *et seq.*, 42 U.S.C. §1981, *et seq.*, 42 U.S.C. § 2000e, *et seq.*, and D.C. CODE § 2-1401, *et seq.* Kenneth B. Ellerbe is named as Defendant in his official capacity as Chief of DCFEMS.

## EXHUASTION OF ADMINISTRATIVE REMEDIES

7. Mr. Kennedy filed a charge of discrimination on or around July 31, 2008, with the Equal Employment Opportunity Commission.

8. Mr. Kennedy's July 31, 2008 charge alleged discrimination on the bases of race and disability.

9. On or around December 2, 2008, Mr. Kennedy amended his charge to include additional acts and the basis of retaliation.

10. On or around February 18, 2009, Mr. Kennedy filed amendments to his charge to include new actions DCFEMS took against him.

11. On or around May 11, 2009, Mr. Kennedy filed additional amendments to his charge to include new actions DCFEMS took against him.

12. On or around May 15, 2009, Mr. Kennedy filed additional amendments to his charge to include new actions DCFEMS took against him.

13. On or around May 20, 2009, Mr. Kennedy filed additional amendments to his charge to include recent actions DCFEMS took against him.

14. On or around September 16, 2009, Mr. Kennedy filed additional amendments to his charge to include new actions DCFEMS took against him.

15. On or around October 27, 2009, Mr. Kennedy filed amendments to the original charge of discrimination to include recent actions DCFEMS took against him.

16. On or around July 2, 2010, Mr. Kennedy filed additional amendments to the original charge of discrimination to include recent actions DCFEMS took against him.

17. On or around July 22, 2010, Mr. Kennedy filed additional amendments to the original charge of discrimination to include recent actions DCFEMS took against him.

18. During Mr. Kennedy's interview in the investigation into his EEO charge, Mr. Kennedy raised all of the allegations outlined herein with the investigator.

19. The investigator investigated and addressed in his determination letter all of the allegations outlined herein.

20. On or around August 31, 2012, the EEOC issued a determination on the charge, finding
    reasonable cause to believe that discrimination occurred and referring the matter to the
    Department of Justice for consideration.

21. On or around June 19, 2013, Mr. Kennedy received a Notice of Right to Sue letter from
    the Department of Justice.

22. Mr. Kennedy has exhausted all administrative remedies.

## FACTUAL ALLEGATIONS

### Background

23. Mr. Kennedy worked for DCFEMS from 2002 through 2013.

24. From September 2002 through in or around January 2003, Mr. Kennedy was a Firefighter
    Recruit assigned to the Fire Training Academy.

25. After graduating from the Fire Training Academy, Mr. Kennedy served as a
    Firefighter/EMT with Engine Company 11.

26. In or around November 2006, Mr. Kennedy transferred from his position with Engine
    Company 11 to the position of Firefighter/EMT with Truck Company 9.

27. Mr. Kennedy served as a Firefighter/EMT with Truck Company 9 until August 2008,
    when he started a 90-day detail to the Fire Prevention Division.

28. Beginning in or around October 2008 and continuing through in or around February
    2009, Mr. Kennedy was on sick leave for stress and adjustment disorder.

29. In November 2008, while on sick leave, Mr. Kennedy was officially promoted to Fire
    Inspector assigned to the Fire Prevention Division.

30. After Mr. Kennedy ran out of sick leave in or around February 2009, he returned to work
    on limited/light duty to the Fire Prevention Division.

31. After his assignment to the Fire Prevention Division, he was assigned to the Training Academy to renew his credentials, until around June 2010.

32. From June 2010 through around September 2010, Mr. Kennedy was assigned to the Training Academy, on full duty status.

33. From September 2010 through around February 2011, Mr. Kennedy was assigned to the Fire Prevention Division but restricted to Office Duty.

34. In or around February 2011, DCFEMS sent Mr. Kennedy to shadow Ward 7 Fire Inspectors for retraining.

35. From February 2011 through in or around May 2013, Mr. Kennedy was assigned to Ward 2 to conduct Fire Inspections.

36. In May 2013, Mr. Kennedy resigned from DCFEMS.

## Mr. Kennedy's Medical Condition

37. In or around 1998, while in the military reserves, Mr. Kennedy was diagnosed with Pseudofolliculitis Barbae ("PFB") by a military doctor.

38. At various times during his military career, Mr. Kennedy requested and received accommodations for his PFB.

39. PFB is a condition that causes persistent irritation on a man's face when he shaves.

40. This irritation results when hair regrowth curls into the skin instead of growing straight out of the follicle, leading to an inflammation reaction.

41. This growth pattern usually results in a bacterial infection.

42. The infected area then becomes inflamed with papules and pustules.

43. PFB impacts normal cell growth of the skin and ability to shave.

44. The only fully effective treatment for PFB is to maintain some facial hair.

45. PFB disproportionately affects African American men.

46. According to the National Institutes of Health, PFB is a disorder that occurs mainly in black men.

47. Some studies conclude that PFB occurs in approximately 94% of black men but only 16% of white men.

48. Other studies estimate that PFB occurs in approximately 3% of white men but between 45% and 83% of black men.

49. In 2008, a Board Certified Dermatologist again diagnosed Mr. Kennedy with PFB.

50. Mr. Kennedy's dermatologist instructed him to maintain facial hair of 1/8 of an inch to treat his PFB.

<u>Masks, Fit Tests, and Facial Hair Policy</u>

51. During all relevant periods, while on a fireground or any other toxic atmosphere, firefighters were required to wear a "self-contained breathing apparatus" ("SCBA").

52. The specific SCBA Mr. Kennedy was required to use was a Scott Air-Pak SCBA.

53. The Scott Air-Pak SCBA is a respirator intended to provide respiratory protection to an individual when entering into, working in, and exiting an objectionable, oxygen deficient, and/or toxic atmosphere.

54. The Scott Air-Pak SCBA consists of a backframe, harness assembly, cylinder, and valve assembly.

55. A facepiece ("mask") is attached to the regulator of the Scott Air-Pak SCBA.

56. The air tank of the SCBA provides a constant flow of pressurized clean air to the mask.

57. The SCBA creates a positive-pressure air mask.

58. A positive-pressure air mask prevents outside air from leaking into the mask.

59. By virtue of its design, even when the mask-wearer breaths in, outside air is prevented from leaking into the SCBA mask.

60. Any imperfections in fit between a firefighter's face and mask will result in clean air leaking from the mask to the outside atmosphere, rather than leakage into the mask.

61. The presence of facial hair may or may not cause an imperfect fit between a firefighter's face and face mask.

62. In addition to facial hair potentially creating a risk of an imperfect fit, other variables create the risk of an imperfect fit.

63. Examples of other variables that may cause an imperfect fit between a firefighter's face and the face mask are prominent cheekbones, a long jaw or nose, or facial scars.

64. The positive-pressure feature of the SCBA means that an imperfect fit does not directly endanger a firefighter's life or health or safety of others.

65. A less than perfect fit will result in a firefighter depleting his or her air supply somewhat faster than a more perfect fit.

66. Other variables may increase the speed with which a firefighter depletes his or her air supply.

67. Variables that may increase the speed with which a firefighter depletes his or her air supply include body weight, physical fitness, respiratory efficiency, and physiological reaction to stress.

68. There is no reason to believe that the presence or absence of facial hair will have a greater effect on the speed with which a firefighter depletes his or her air supply than other variables have, as described above.

69. Firefighters with facial hair present no greater risk to themselves or others, when fighting or operating in any hazardous atmosphere, than clean-shaven firefighters.

70. If a proper fit is not possible with the standard issue SCBA and mask, DCFEMS has alternative equipment firefighters can use in its place.

71. DCFEMS owns powered air-purifying respirators ("PAPRs").

72. PAPRs are generally used by the Heavy Duty Rescue Squad and the HAZMAT.

73. A PAPR is similar to the APR formed by a face mask and go-bag filter, except that in a PAPR, a battery operated fan pushes air through the filter.

74. As a result of the battery operated fan pushing air through the filter, a positive-pressure atmosphere is created inside the face mask.

75. As a result of the positive-pressure atmosphere in the face mask, any leakage is outward.

76. A PAPR also eliminates the need for the user to operate the filter through his or her own respiratory effort.

77. In 2001, DCFEMS implemented a grooming policy that prohibited beards.

78. A number of firefighters challenged the grooming policy under the Religious Freedom Restoration Act ("RFRA").

79. As a result of the challenge in 2001 to the policy, the District Court for the District of Columbia preliminary enjoined enforcement of the policy.

80. DCFEMS adhered to that preliminary injunction until in or around May 25, 2005.

81. On or around May 25, 2005, then Chief Adrian Thompson issued a memorandum stating that, effective Monday June 6, 2005, DCFEMS would begin to enforce Section 20(9)(b) of Article XXI of the Order Book, relating to facial hair, in preparation for implementation of a face mask fit testing program.

82. Section 20(9)(b) of Article XXI of the Order Book states that firefighters are not permitted to have facial hair that comes between the sealing surface of the facepiece and the face or that interferes with the valve function.

83. A "Fit Test" is designed to test the seal between a firefighter's face and the respirator mask.

84. A respirator quantitative Fit Test must be performed to ensure the correct respirator facepiece size has been selected for the user.

85. The Fit Test is used to determine whether a firefighter can wear a mask without risk of air leakage.

86. The May 25, 2005 Memorandum stated that firefighters were not permitted to have facial hair between the sealing surface of the face mask and the face or that interferes with the valve function.

87. The Memorandum further stated that firefighters who did not comply with the facial hair policy regarding shaving ("Policy") would be removed from field operations, placed on administrative duty status, and be ordered to submit a special report regarding their noncompliance.

88. The Memorandum went on to state that firefighters not in compliance with the Policy must come into compliance by the next work day.

89. Under the Policy, firefighters who refused to be clean shaven would be ordered to submit a second special report regarding the noncompliance.

90. Under the Policy, beginning with the second day of noncompliance, the firefighter would receive a 12 hours suspension.

91. A noncomplying firefighter would, under the Policy, receive a 24-duty hour suspension for the third day of noncompliance.

92. Any firefighter failing to comply with the facial hair Policy for four days would be recommended for termination.

93. The Memorandum went on to state that firefighters with PFB would be ordered to report to the Police and Fire Clinic for evaluation and referral to their private physicians and would be placed on their own sick leave until they are cleared to return to full duty.

94. On or around August 11, 2005, the District Court for the District of Columbia modified an existing injunction in light of the May 25, 2005 memorandum, and stated the DCFEMS could assign to administrative duties employees who could not pass Fit Tests but that DCFEMS must afford firefighters a reasonable opportunity to demonstrate they could pass the test.

95. In 2007, the United States District Court of the District of Columbia found that the Policy violated the Religious Freedom Restoration Act ("RFRA") by requiring firefighters to shave even when their sincerely held religious beliefs required that they maintain beards.

96. In 2009, the United States Court of Appeals for the District of Columbia upheld the 2007 decision of the United States District Court of the District of Columbia.

97. In *Potter v. D.C.*, 558 F.3d 542 (D.C. Cir. 2009), the Court held that the Policy violated the RFRA.

98. The Court held that the Policy violated the RFRA because, under the Policy, DCFEMS ordered firefighters, whose religious beliefs required them to maintain beards, to shave.

99. The Court held that this was a violation of the RFRA because the Policy was not the least restrictive policy available to reach the goal of protecting the safety of the firefighters.

100.     The Court affirmed the finding of the District Court for the District of Columbia

that the Policy was not sufficiently narrowly tailored.

101.     The District of Columbia did not appeal the finding of the District Court for the

District of Columbia that the Policy was not the least restrictive policy available.

102.     The Court also held that throughout litigation of the matter, the District of

Columbia conceded that firefighters with beards can safely wear SCBAs.

Events at Issue

103.     Until in or around May 2008, Mr. Kennedy attempted to be clean shaven.

104.     As a result of Mr. Kennedy maintaining a clean shave, he had an infected area on

his cheek due to his PFB.

105.     Mr. Kennedy attempted to treat the infected area with medication, but it did not

heal the affected area.

106.     On or around May 29, 2008, Mr. Kennedy reported to the Police and Fire Clinic

("PFC") for a matter unrelated to his skin condition.

107.     During the May 29, 2008 appointment at PFC, Mr. Kennedy informed Dr.

Malomo that he had a spot in his face that would not heal due to close shaving.

108.     Mr. Kennedy also informed Dr. Malomo during their May 29, 2008 meeting that a

prescription topical lotion he was using did not provide relief to the irritation caused by

shaving.

109.     Dr. Malomo stated that PFC doctors could not issue a shaving waiver.

110.     Dr. Malomo instructed Mr. Kennedy to obtain a letter from a doctor regarding his

skin condition.

111.     On or around May 30, 2008, Mr. Kennedy returned to PFC with a letter from his

doctor noting that Mr. Kennedy should avoid shaving.

112.     After receiving the letter on May 30, 2008, Dr. Malomo placed Mr. Kennedy on

limited duty.

113.     Also after receiving the letter on May 30, 2008, Dr. Malomo advised Mr.

Kennedy to follow-up with a dermatologist.

114.     On or around June 26, 2008, Mr. Kennedy saw Dr. Barnett, a Board Certified

Dermatologist.

115.     On or around June 26, 2008, after examining Mr. Kennedy, Dr. Barnett diagnosed

Mr. Kennedy with PFB.

116.     Based on the diagnosis of PFB, Dr. Barnett instructed Mr. Kennedy not to shave

closely.

117.     Based on the diagnosis of PFB, Dr. Barnett instructed Mr. Kennedy to maintain

facial hair at a length of at least 1/8 of an inch.

118.     On or around July 2, 2008, Mr. Kennedy presented documents with Dr. Barnett's

diagnosis and recommendation to Battalion Fire Chief ("BFC") Begley and Dr. Malomo.

119.     After receiving Mr. Kennedy's medical documents on July 2, 2008, BFC Begley

stated to Mr. Kennedy that he, Mr. Kennedy, does not have any bumps on his face.

120.     On or around July 2, 2008, BFC Begley stated that because Mr. Kennedy did not

have any bumps on his face, Mr. Kennedy did not have PFB.

121.     After receiving Mr. Kennedy's medical documents noted on July 2, 2008, BFC

Begley placed Mr. Kennedy back on full-duty status, effective July 3, 2008.

122.     The first day after July 2, 2008 that Mr. Kennedy was required to report for duty was July 9, 2008.

123.     On or around July 9, 2008, Mr. Kennedy reported to PFC for consultation regarding his PFB with a DCFEMS doctor.

124.     On or around July 9, 2008, Mr. Kennedy requested sick leave due to his PFB.

125.     BFC Begley denied Mr. Kennedy's July 9, 2008 request for sick leave.

126.     On or around July 9, 2008, BFC Begley ordered Mr. Kennedy to report to the quarters of Engine 9.

127.     On July 9, 2008, Mr. Kennedy reported for duty at the quarters of Engine 9, as ordered.

128.     On July 10, 2008, Mr. Kennedy reported for duty at the quarters of Engine 9, as ordered.

129.     On or around July 10, 2008, Mr. Kennedy was ordered to submit a Special Report.

130.     On or around July 10, 2008, Mr. Kennedy submitted a Special Report regarding his inability to shave.

131.     In his July 10, 2008 Special Report, Mr. Kennedy indicated that he believed he was being discriminated against and that DCFEMS should accommodate his PFB.

132.     From July 2008 and continuing throughout his employment, Mr. Kennedy often expressed to DCFEMS that he believed DCFEMS's actions against him were discriminatory and retaliatory.

133.     On July 11, 2008, Mr. Kennedy reported for duty at the quarters of Engine 9.

134.     From July 12-24, 2008, Mr. Kennedy continued to report to duty at the quarters of Engine 9 without incident.

135.     On or around July 25, 2008, BFC Maxim Saunders issued a memorandum to Mr. Kennedy notifying Mr. Kennedy of an August 14, 2008 hearing to address Mr. Kennedy's noncompliance with the Policy.

136.     On or around July 29, 2008, Mr. Kennedy issued a memorandum to Assistant Fire Chief Alfred Jeffrey III, explaining the events occurring between May and July 2008, outlined herein.

137.     In Mr. Kennedy's July 29, 2008 memorandum, he indicated that he believed the proposed disciplined was discriminatory and that he opposed the discipline.

138.     On or around July 29, 2008, BFC Saunders issued a memorandum to Mr. Kennedy stating:

   a.   Mr. Kennedy was eligible for a 12 hour suspension on July 10, 2008.

   b.   Mr. Kennedy was eligible for a 24 hour suspension on July 11, 2008;

   c.   Mr. Kennedy was eligible for recommendation for termination on July 14, 2008;

   d.   A BFC conference was scheduled for August 14, 2008 to address the 36 hours of suspension; and

   e.   Mr. Kennedy was placed on administrative leave as of July 29, 2008 and ordered to contact Chief Grambo daily at 0700 hours.

139.     On or around July 31, 2008, Dr. Smith-Jeffries at PFC noted that she discussed Mr. Kennedy's condition with Mr. Kennedy's dermatologist, who stated that Mr. Kennedy's condition is best controlled by maintaining 1/8 of an inch of facial hair.

140.     Dr. Smith-Jeffries noted, on or around July 31, 2008, that she informed Mr. Kennedy's dermatologist that despite Mr. Kennedy's medical condition, Mr. Kennedy was required to present clean shaven for respirator use.

141.     On or around August 5, 2008, BFC Bruce Faust issued a memorandum outlining a proposed suspension, not to exceed 72 hours, for Mr. Kennedy's failure to comply with the Policy on July 10, 2008.

142.     Mr. Kennedy received the August 5, 2008 memorandum, noted in paragraph 141, on or around August 13, 2008.

143.     On or around August 5, 2008, BFC Bruce Faust issued a memorandum outlining a proposed suspension, not to exceed 72 hours, for Mr. Kennedy's failure to comply with the Policy on July 28, 2008.

144.     Mr. Kennedy received the August 5, 2008 memorandum, noted in paragraph 143, on or around August 13, 2008.

145.     On or around August 6, 2008, BFC Bruce Faust signed a Disciplinary Action Memorandum noting that Mr. Kennedy would be suspended for 12 hours for his failure to comply with the Policy on July 10, 2008.

146.     On or around August 6, 2008, BFC Bruce Faust signed a Disciplinary Action Memorandum noting that Mr. Kennedy would be suspended for 24 hours for his failure to comply with the Policy on July 28, 2008.

147.     These actions caused Mr. Kennedy significant stress and anxiety, particularly because he anticipated that, according to DCFEMS Policy, DCFEMS would ultimately terminate him.

148.      DCFEMS was forcing Mr. Kennedy to choose between following his doctor's medical orders and being terminated or ignoring the medical orders and keeping his job.

149.      Mr. Kennedy began to experience sleeplessness, fatigue, loss of appetite, and other physical effects of the stress.

150.      On or around August 13, 2008, Mr. Kennedy submitted a memorandum challenging the suspensions.

151.      On or around August 22, 2008, Mr. Kennedy passed a Fit Test.

152.      When Mr. Kennedy passed the Fit Test on or around August 22, 2008, he had a beard.

153.      On or around October 1, 2008, a BFC conference was held as part of Mr. Kennedy's appeal of the charges of noncompliance.

154.      At the BFC conference on October 1, 2008, the charges against Mr. Kennedy were upheld.

155.      On or around October 3, 2008, Mr. Kennedy reported to the Police and Fire Clinic for his PFB.

156.      When Mr. Kennedy reported to PFC on October 3, 2008, Chief Begley inquired into whether Mr. Kennedy had any bumps or inflammation.

157.      After Mr. Kennedy's October 3, 2008 report to PFC, Chief Begley continued to state that they would not place Mr. Kennedy on sick leave.

158.      On or around October 6, 2008, Mr. Kennedy reported to PFC for examination of his PFB.

159.     After Mr. Kennedy's October 6, 2008 report to PFC, Chief Begley continued to

state that DCFEMS would not place Mr. Kennedy on sick leave and that he must comply

with the clean-shaven Policy.

160.     As a result of the incidents outlined above, Mr. Kennedy continued to worry that

DCFEMS intended to terminate him.

161.     After Mr. Kennedy's October 6, 2008 report to PFC, he asked to be referred to the

Behavioral Health Section of the PFC to see a psychologist for stress.

162.     Also after Mr. Kennedy's October 6, 2008 report to PFC, he obtained a referral

from his primary care physician for a psychiatric exam.

163.     In or around October 2008, Mr. Kennedy was diagnosed with adjustment disorder

and depression.

164.     On or around October 9, 2008, Mr. Kennedy submitted a notice of appeal of his

12 and 24 hour suspensions.

165.     Beginning in or around October 2008 and continuing through January 2009, Mr.

Kennedy was on sick leave for depression, stress, and adjustment disorder.

166.     On or around November 12, 2008, Assistant Fire Chief Brian K. Lee upheld the

decision to suspend Mr. Kennedy for 12 hours, noting that Mr. Kennedy was suspended

for 12 duty hours, from November 17, 2008 through November 18, 2008.

167.     On or around November 12, 2008, Assistant Fire Chief Brian K. Lee upheld the

decision to suspend Mr. Kennedy for 24 hours, noting that Mr. Kennedy was suspended

for 24 duty hours, from November 19, 2008 through November 21, 2008.

168.     On or around November 14, 2008, DCFEMS requested that the Department of

Health place Mr. Kennedy's EMS certification in Medical Suspension status.

169.     On or around November 21, 2008, Brian K. Lee, Assistant Fire Chief, issued a

memorandum stating a Fire Trial Board Hearing would take place on January 2, 2009,

regarding Mr. Kennedy's noncompliance with Lieutenant Williams Spencer's advisement

to Mr. Kennedy that Mr. Kennedy could not assume duty until he was in full compliance

with the Policy.

170.     These actions caused Mr. Kennedy significant stress and anxiety, particularly

because he anticipated that, according to DCFEMS Policy, DCFEMS would ultimately

attempt to terminate him.

171.     In or around January 2009, DCFEMS did not permit Mr. Kennedy to use donated

use or lose leave.

172.     Mr. Kennedy returned to the workplace in or around January or February 2009.

173.     When Mr. Kennedy returned to the workplace as referenced in paragraph number

172, he was sent back to the Fire Prevention Division on limited/light duty.

174.     In or around February 2009, Mr. Kennedy was assigned to the Training Academy

to renew his credentials.

175.     Mr. Kennedy served in a limited/light duty status in the Training Academy until

June 2010.

176.     When Mr. Kennedy was assigned to the Training Academy as described in

paragraphs 172-175, it was due to his diagnoses of depression and adjustment disorder.

177.     On or around March 17, 2009, Mr. Kennedy saw a doctor at PFC.

178.     While seeing a doctor at PFC on or around March 17, 2009, Mr. Kennedy

reiterated his request for accommodation for his PFB.

179.        After examining Mr. Kennedy on or around March 17, 2009, the doctor at PFC

recommended that Mr. Kennedy remain on limited duty.

180.        On or around March 16, 2009 DCFEMS scheduled the Trial Board to convene for

Mr. Kennedy's termination process due to noncompliance with the Facial Hair Policy.

181.        On or around March 20, 2009, a doctor at PFC examined Mr. Kennedy and

recommended that Mr. Kennedy continue to work on limited duty status.

182.        On or around March 23, 2009, DCFEMS notified Mr. Kennedy that he was being

subjected to the Involuntary Retirement Process.

183.        On or around May 6, 2009, DCFEMS charged Mr. Kennedy with false testimony

related to testimony he provided to City Council on or around March 4, 2009.

184.        On or around July 9, 2009, DCFEMS ordered Mr. Kennedy to work Wednesday

through Sunday, with duty hours of 1500 to 2300 hours each day.

185.        According to DCFEMS policy in place on or around July 9, 2009, limited/light

duty assignments were to be Monday through Friday on the day shift.

186.        On or around August 12, 2009, Mr. Kennedy was examined by a doctor at PFC.

187.        During the examination on or around August 12, 2009, the doctor at PFC noted

bumps on Mr. Kennedy's face.

188.        On or around August 13, 2009, Mr. Kennedy participated in a disability interview

with DCFEMS.

189.        In or around September 2009, Mr. Kennedy attempted to be Fit Tested.

190.        DCFEMS denied Mr. Kennedy's September 2009 attempt to be Fit Tested.

191.        On or around September 10, 2009, PFC recommended that Mr. Kennedy be

considered for disability retirement.

192.     On or around October 8, 2009, Mr. Kennedy restated his request for a reasonable accommodation of being permitted to maintain 1/8 of an inch of facial hair.

193.     On or around November 9, 2009, DCFEMS notified Mr. Kennedy that he was required to participate in a Labor Market Survey.

194.     On or around November 9, 2009, DCFEMS informed Mr. Kennedy that the requirement to participate in a Labor Market Survey was part of the Involuntary Retirement Process.

195.     On or around March 1, 2010, Lieutenant Marie A. Rosich, who worked with employees to maintain current EMT credentials at the time, ordered Mr. Kennedy to take the National Registry of Emergency Medical Technicians (NREMT) Exam.

196.     Firefighters were required to take the NREMT exam for certification by the District of Columbia Department of Health.

197.     In response to Lt. Rosich's March 1, 2010 order, Mr. Kennedy stated that he would obtain medical documentation to exempt him from taking the exam.

198.     On or around April 8, 2010, DCFEMS issued correspondence to Mr. Kennedy, notifying him again that he had been referred for disability retirement consideration.

199.     On or around April 9, 2010, Ms. Rosich again ordered Mr. Kennedy to take the NREMT Exam.

200.     In response to Lt. Rosich's April 9, 2010 order, Mr. Kennedy stated that his understanding was that the exam was not necessary because DCFEMS was subjecting him to involuntary retirement.

201.     As a result of the April 2010 incidents with Lt. Rosich, described above, Lt. Rosich charged Mr. Kennedy with insubordination.

202.     On or around April 26, 2010, DCFEMS ordered Mr. Kennedy to submit a Special

Report explaining why he had not scheduled an NREMT Exam.

203.     On or around May 3, 2010, BFC Justin B. Brown endorsed Lt. Rosich's charge

against Mr. Kennedy of insubordination.

204.     On or around May 6, 2010, Mr. Kennedy received notification from DCFEMS

that the hearing regarding his disability retirement was scheduled for May 27, 2010

before the Police and Firefighters' Retirement and Relief Board (PFRRB).

205.     The notification regarding Mr. Kennedy's disability retirement hearing that Mr.

Kennedy received on or around May 6, 2010 was dated April 8, 2010.

206.     The notification regarding Mr. Kennedy's disability retirement hearing that Mr.

Kennedy received on or around May 6, 2010 contained multiple forms for Mr. Kennedy

to complete and return in five business days.

207.     Mr. Kennedy requested an extension of the deadline to complete the forms

contained in the notification regarding his disability retirement that he received on or

around May 6, 2010.

208.     On or around May 19, 2010, BFC Begley informed Mr. Kennedy that BFC

Begley had scheduled a psychological examination with PFC for Mr. Kennedy for 3:15

pm on May 20, 2010.

209.     BFC Begley provided Mr. Kennedy the notification referenced in paragraph

number 208 around 3:00 pm.

210.     In response to BFC Begley's notification to Mr. Kennedy regarding the May 20,

2010 psychological examination, Mr. Kennedy requested that the examination be

rescheduled for May 21, 2010.

211.     In requesting that BFC Begley allow Mr. Kennedy to reschedule the May 20, 2010 psychological examination, Mr. Kennedy explained to BFC Begley that he wanted time to speak with his attorney.

212.     BFC Begley denied Mr. Kennedy's request to reschedule the May 20, 2010 psychological examination.

213.     DCFEMS advised Mr. Kennedy that the time of his psychological examination on May 20, 2010 at PFC was changed from 3:15 pm to 8:00 am.

214.     Mr. Kennedy reported to PFC at 8:00 am on May 20, 2010.

215.     Mr. Kennedy did not undergo the examination on May 20, 2010.

216.     Mr. Kennedy did not undergo the examination on May 20, 2010 because he believed that it was discriminatory and retaliatory and because he feared what actions DCFEMS would take based upon the examination.

217.     On or around May 20, 2010, BFC Begley ordered Mr. Kennedy to submit a Special Report explaining the reason Mr. Kennedy did not complete the examination.

218.     On or around May 24, 2010, Mr. Kennedy submitted another request for extension of the PFRRB's May 27, 2010 scheduled hearing of his disability retirement.

219.     Mr. Kennedy submitted his May 24, 2010 request for extension around 3:35 pm.

220.     Around 3:44 pm on May 24, 2010, BFC Begley emailed Mr. Kennedy's chain of command, stating that Mr. Kennedy's limited duty status was being terminated.

221.     In BFC Begley's email referenced in paragraph 220, BFC Begley stated that the reason for the termination of Mr. Kennedy's limited duty status was that Mr. Kennedy did not complete the psychological examination on May 20, 2010.

222.     On or around May 24, 2010, DCFEMS placed Mr. Kennedy on sick leave until he completed the psychological examination.

223.     On or around May 26, 2010, DCFEMS advised Mr. Kennedy that he was scheduled for a psychological examination with PFC on May 27, 2010.

224.     As Mr. Kennedy's PFRRB hearing was also scheduled for May 27, 2010, he requested a continuance of the hearing.

225.     Mr. Kennedy's PFRRB hearing was rescheduled for July 22, 2010.

226.     On or around June 11, 2010, PFC returned Mr. Kennedy to full duty status, while he still had 1/8 of an inch of facial hair.

227.     When PFC returned Mr. Kennedy to full duty status on or around June 11, 2010, they assigned him to the Training Academy.

228.     DCFEMS returned Mr. Kennedy to work at the Training Academy because they would not allow him to be in the field due to his 1/8 of an inch of facial hair.

229.     On or around June 18, 2010, Deputy Fire Chief Lawrence Anderson endorsed the April 26, 2010 Special Report, concurring with Lt. Rosich and Chief Brown's charge against Mr. Kennedy of insubordination.

230.     On or around June 29, 2010, Chief Anderson served Mr. Kennedy with two charges of insubordination.

231.     One of the June 29, 2010 insubordination charges was based on Mr. Kennedy's failure to schedule an NREMT exam.

232.     The charge based on the failure to schedule an NREMT exam recommended an 80-hour suspension without pay.

233.     The other June 29, 2010 insubordination charge was based on Mr. Kennedy not completing the psychological examination.

234.     The charge based on Mr. Kennedy not completing the psychological examination recommended a 120-hour suspension without pay.

235.     These actions caused Mr. Kennedy significant stress and anxiety.

236.     On or around July 7, 2010, DCFEMS held a Deputy Fire Chief Conference with Chief Wayne K. Branch regarding the June 29, 2010 proposed suspensions.

237.     During the July 7, 2010 Conference, Chief Branch requested a written statement from Mr. Kennedy's PFC doctor regarding his medical condition and ability to test.

238.     During the July 7, 2010 Conference, Chief Branch indicated that if the PFC doctor concurred with Mr. Kennedy's psychiatrist, the proposed 80-hour insubordination charge would be dismissed.

239.     On or around July 8, 2010, Mr. Kennedy received notification from PFRRB that he was ineligible for disability retirement in light of his return to full duty.

240.     On or around July 20, 2010, Chief Begley ordered Mr. Kennedy to the PFC for evaluation.

241.     On or around July 20, 2010, PFC placed Mr. Kennedy on sick leave.

242.     When the PFC placed Mr. Kennedy on sick leave on or around July 20, 2010, the PFC did not specify an illness or injury.

243.     DCFEMS maintained Mr. Kennedy on sick leave until he provided documentation from his psychiatrist stating that he could return to full duty.

244.     As a result of DCFEMS placing Mr. Kennedy on leave on or around July 20, 2010, Mr. Kennedy was forced to use approximately 69 hours of sick leave and 11 hours of annual leave.

245.     On or around August 25, 2010, Mr. Kennedy requested to have his 80 hours of leave restored.

246.     DCFEMS did not restore Mr. Kennedy's requested 80 hours.

247.     On or around August 30, 2010, Mr. Kennedy reported to the Training Academy for Firefighter Refresher Training.

248.     When Mr. Kennedy reported to the Training Academy on or around August 30, 2010, Captain Michael Knight ordered Mr. Kennedy to shave his 1/8 of an inch of facial hair before participating in the Refresher Training.

249.     When Mr. Kennedy reported to Training Academy on or around August 30, 2010, Captain Knight ordered Mr. Kennedy to submit a Special Report explaining that it was against medical advice for him to shave.

250.     In response to Captain Knight's August 30, 2010 order, noted in paragraph 257, Mr. Kennedy referred Captain Knight to his Special Report noted in paragraph 130.

251.     On or around August 31, 2010, Mr. Kennedy reported for the Firefighter Refresher Training.

252.     On or around August 31, 2010, Mr. Kennedy completed the Firefighter Refresher Training with his 1/8 of an inch of facial hair.

253.     On or around September 24, 2010, Mr. Kennedy attempted to get Fit Tested.

254.     When Mr. Kennedy attempted to be Fit Tested on or around September 24, 2010, Deputy Fire Chief William Flint of the Risk Management Division denied Mr. Kennedy the opportunity to be Fit Tested.

255.     When DFC Flint denied Mr. Kennedy the opportunity to be Fit Tested on or around September 24, 2010, he stated that Mr. Kennedy could not take the Fit Test because he was not claiming a religious exemption to maintain a beard.

256.     When DFC Flint denied Mr. Kennedy the opportunity to be Fit Tested on or around September 24, 2010, Mr. Kennedy explained that he had been requesting a reasonable accommodation for his medical condition since July 2008.

257.     On or around September 28, 2010, Mr. Kennedy reported to the Fire Prevention Division on full duty status.

258.     When Mr. Kennedy reported to duty on or around September 28, 2010, he was ordered to submit a Special Report, in accordance with the May 25, 2005 Memorandum described above, to explain why he did not shave, in violation of the Policy.

259.     On or around September 28, 2010, Mr. Kennedy submitted a Special Report as Ordered.

260.     On or around October 1, 2010, Mr. Kennedy was ordered to submit a Day Two Special Report.

261.     On or around October 1, 2010, Mr. Kennedy submitted a Day Two Special Report.

262.     On or around October 4, 2010, Mr. Kennedy was ordered to submit a Day Three Special Report.

263.     On or around October 4, 2010, Mr. Kennedy submitted a Day Three Special
Report.

264.     On or around October 5, 2010, Mr. Kennedy was ordered to submit a Day Four
Special Report.

265.     On or around October 5, 2010, Mr. Kennedy submitted a Day Four Special
Report.

266.     On or around October 6, 2010, Mr. Kennedy was ordered to submit a Day Five
Special Report.

267.     On or around October 6, 2010, Mr. Kennedy submitted a Day Five Special
Report.

268.     On or around October 27, 2010, BFC Mitchell Molenof asked Mr. Kennedy if he
had completed his annual Fit Test.

269.     In response to BFC the October 27, 2010 inquiry, Mr. Kennedy notified BFC
Molenof that he had not been permitted to take the Fit Test when he attempted to do so.

270.     On or around November 17, 2010, Mr. Kennedy received notification of Chief
Branch's decision upholding the two June 29, 2010 charges of insubordination.

271.     In Deputy Fire Chief Branch's November 17, 2010 decision, he reduced the
charge proposing an 80-hour suspension to a 12-hour suspension.

272.     In Deputy Fire Chief Branch's November 17, 2010 decision, he reduced the
charge proposing a 120-hour suspension to a 60-hour suspension.

273.     On or around November 23, 2010, Mr. Kennedy received Notification of
Proposed Charges for Neglect of Duty and Insubordination.

274.    The November 23, 2010 charges, referenced in paragraph number 273, were based on Mr. Kennedy's alleged noncompliance with the Policy.

275.    The November 23, 2010 charges, referenced in paragraph number 273, proposed a total of 36 hours of suspension without pay.

276.    The November 23, 2010 charges, referenced in paragraph number 273, also noted that DCFEMS would hold a Fire Trial Board seeking Mr. Kennedy's termination.

277.    On or around December 2, 2010, Mr. Kennedy appealed Deputy Fire Chief Branch's November 17, 2010 decision regarding Mr. Kennedy's suspension based on charges of insubordination.

278.    On or around December 7, 2010, a BFC Conference was held regarding the November 23, 2010 charges against Mr. Kennedy.

279.    BFC Raymond C. Gretz presided over the December 7, 2010 BFC Conference.

280.    At the December 7, 2010 BFC Conference, Mr. Kennedy requested that the charges against him be dropped and that no further action be taken against him for alleged noncompliance with the Policy.

281.    On or around December 9, 2010, Mr. Kennedy received notification of BFC Gretz's decision to uphold the November 23, 2010 proposed suspension.

282.    On or around December 22, 2010, Mr. Kennedy appealed BFC Gretz's decision upholding the November 23, 2010 proposed suspension.

283.    DCFEMS did not grant Mr. Kennedy's December 22, 2010 appeal.

284.    From September 2010 through February 2011, DCFEMS assigned Mr. Kennedy to the Fire Prevention Division but restricted him to Office Duty.

285.    Mr. Kennedy was on restricted Office Duty from September 2010 through February 2011 because DCFEMS would not permit him to be in the Field due to him maintaining 1/8 of an inch of facial hair.

286.    From March 2011 through May 2013, Mr. Kennedy was assigned to Ward 2 to conduct Fire Inspections.

287.    Due to years of discrimination and retaliation by DCFEMS, Mr. Kennedy became disillusioned with the idea of continuing employment with Defendant, and as such, he resigned in or around May 2013.

<u>Damages</u>

288.    As a result of DCFEMS actions against Mr. Kennedy described herein, he lost pay and corresponding benefits.

289.    As a result of DCFEMS actions against Mr. Kennedy described herein, he used leave he would not have otherwise used.

290.    As a result of DCFEMS actions against Mr. Kennedy described herein, he experienced anxiety, depression, sleeplessness, agitation, and other manifestations of emotional pain and suffering.

291.    As a result of DCFEMS actions against Mr. Kennedy described herein, he sought medical treatment for his anxiety and depression.

292.    As a result of DCFEMS actions against Mr. Kennedy described herein, his reputation was irreparably harmed.

293.    Mr. Kennedy took all appropriate actions to mitigate damages.

## COUNT 1: DISPARATE IMPACT ON THE BASIS OF RACE IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

294.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-293 as if stated herein.

295.     Under Title VII of the Civil Rights Act of 1964, it is an unlawful employment practice for an employer to maintain a particular employment practice that causes a disparate impact on the basis of race.

296.     As a result of DCFEMS's Policy that calls for discipline of firefighters who are not clean shaven, individuals who cannot shave because of PFB are disciplined.

297.     Significantly more black men have PFB than white men.

298.     The Policy has a disparate, adverse impact on black men.

299.     The Policy is not job related.

300.     The Policy is not consistent with business necessity.

301.     Alternative policies with lesser impact exist.

302.     At all times relevant to the complaint, DCFEMS was aware of previous injunctions, based on the RFRA, that enjoined DCFEMS from enforcing the Policy against individuals who maintained beards for religious reasons.

303.     This Policy constitutes a violation of 42 U.S.C. § 2000e, *et seq.*

304.     This Policy was enforced with malice or reckless indifference to Mr. Kennedy's rights under Title VII.

305.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 2: DISPARATE IMPACT ON THE BASIS OF RACE IN VIOLATION OF SECTION 1983 OF THE CIVIL RIGHTS ACT OF 1871

306.　　Mr. Kennedy incorporates all the allegations contained in paragraphs 1-305 as if stated herein.

307.　　Under section 1983 of the Civil Rights Act of 1871 it is an unlawful employment practice for the District of Columbia to subject, or cause to subject, a citizen to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

308.　　Under Title VII of the Civil Rights Act of 1964, it is an unlawful employment practice for an employer to maintain a particular employment practice that causes a disparate impact on the basis of race.

309.　　As a result of DCFEMS's Policy that calls for discipline of firefighters who are not clean shaven, individuals who cannot shave because of PFB are disciplined.

310.　　Significantly more black men have PFB than white men.

311.　　The Policy has a disparate, adverse impact on black men.

312.　　The Policy is not job related.

313.　　The Policy is not consistent with business necessity.

314.　　Alternative policies with lesser impact exist.

315.　　At all times relevant to the complaint, DCFEMS was aware of previous injunctions, based on the RFRA, that enjoined DCFEMS from enforcing the Policy against individuals who maintained beards for religious reasons.

316.　　This Policy constitutes a violation of 42 U.S.C. § 2000e, *et seq.*

317.　　By depriving Mr. Kennedy of his rights, privileges, and immunities under 42 U.S.C. § 2000e, *et seq.*, the Policy is a violation of 42 U.S.C. 1983, *et seq.*

318.     This Policy was enforced with malice, with an evil mind, and with reckless

indifference to Mr. Kennedy's rights federally protected rights.

319.     As the direct and proximate result of the acts and omissions of Defendant, as

described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings,

mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and

humiliation.

## COUNT 3: DISPARATE IMPACT ON THE BASIS OF RACE IN VIOLATION OF SECTION 1981 OF THE CIVIL RIGHTS ACT OF 1866

320.     Mr. Kennedy incorporates all allegations in paragraphs 1-319, as stated herein.

321.     The Civil Rights Act of 1866, 42 U.S.C. § 1981 *et seq.*, prohibits discrimination

on the basis of race in the making, enforcement, performance, modification, and

termination of contracts, including employment contracts, and the enjoyment of all

benefits, privileges, terms, and conditions of the contractual relationship.

322.     As a result of DCFEMS's Policy that calls for discipline of firefighters who are

not clean shaven, individuals who cannot shave because of PFB are disciplined.

323.     Significantly more black men have PFB than white men.

324.     The Policy has a disparate, adverse impact on black men.

325.     The Policy is not job related.

326.     The Policy is not consistent with business necessity.

327.     Alternative policies with lesser impact exist.

328.     At all times relevant to the complaint, DCFEMS was aware of previous

injunctions, based on the RFRA, that enjoined DCFEMS from enforcing the Policy

against individuals who maintained beards for religious reasons.

329.     Defendant's actions described above constitute unlawful racial discrimination in violation of 42 U.S.C. § 1981, *et seq.*

330.     Defendant enforced this Policy with malice, with an evil mind, and with reckless indifference to Plaintiff's federally protected rights.

331.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 4: DISPARATE IMPACT ON THE BASIS OF DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

332.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-331 as if stated herein.

333.     Under the Americans with Disabilities Act ("ADA"), it unlawful to use qualifications, standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question, consistent with business necessity, and the least restrictive policy available.

334.     As a result of DCFEMS's Policy that calls for discipline of firefighters who are not clean shaven, individuals who cannot shave because of PFB are disciplined.

335.     PFB is a medical condition that impacts cell growth and ability to shave.

336.     PFB qualifies as a disability under 42 U.S.C. § 12101, *et seq.*

337.     The Policy has a disparate, adverse impact on individuals suffering from PFB.

338.     The Policy is not job related.

339.     The Policy is not consistent with business necessity.

340.     Alternative policies with lesser impact exist.

341.     At all times relevant to the complaint, DCFEMS was aware of previous injunctions, based on the RFRA, that enjoined DCFEMS from enforcing the Policy against individuals who maintained beards for religious reasons.

342.     This Policy constitutes a violation of 42 U.S.C. § 12101, *et seq.*

343.     This Policy was enforced with malice or reckless indifference to Mr. Kennedy's rights under the ADA.

344.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 5: DISPARATE IMPACT ON THE BASIS OF DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AMENDMENTS ACT

345.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-344 as if stated herein.

346.     Under the Americans with Disabilities Act Amendments Act ("ADAAA"), it is unlawful to use qualifications, standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question, consistent with business necessity, and the least restrictive policy available.

347.     As a result of DCFEMS's Policy that calls for discipline of firefighters who are not clean shaven, individuals who cannot shave because of PFB are disciplined.

348.     PFB is a medical condition that impacts cell growth and ability to shave.

349.     PFB qualifies as a disability under 42 U.S.C. § 12101, *et seq*.

350.     The Policy has a disparate, adverse impact on individuals suffering from PFB.

351.     The Policy is not job related.

352.     The Policy is not consistent with business necessity.

353.     Alternative policies with lesser impact exist.

354.     At all times relevant to the complaint, DCFEMS was aware of previous injunctions, based on the RFRA, that enjoined DCFEMS from enforcing the Policy against individuals who maintained beards for religious reasons.

355.     This Policy constitutes a violation of 42 U.S.C. § 12101, *et seq*.

356.     This Policy was enforced with malice or reckless indifference to Mr. Kennedy's rights under the ADAAA.

357.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

**COUNT 6: DISPARATE IMPACT ON THE BASIS OF DISABILITY IN VIOLATION OF SECTION 1983 OF THE CIVIL RIGHTS ACT OF 1871**

358.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-357 as if stated herein.

359.     Under section 1983 of the Civil Rights Act of 1871 it is an unlawful employment practice for the District of Columbia to subject, or cause to subject, a citizen to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

360.    Under the ADA and ADAAA, it unlawful to use qualifications, standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question, is consistent with business necessity, and the least restrictive policy available.

361.    As a result of DCFEMS's Policy that calls for discipline of firefighters who are not clean shaven, individuals who cannot shave because of PFB are disciplined.

362.    PFB is a medical condition that impacts cell growth and ability to shave.

363.    PFB qualifies as a disability under 42 U.S.C. § 12101, *et seq*.

364.    The Policy has a disparate, adverse impact on individuals suffering from PFB.

365.    The Policy is not job related.

366.    The Policy is not consistent with business necessity.

367.    Alternative policies with lesser impact exist.

368.    At all times relevant to the complaint, DCFEMS was aware of previous injunctions, based on RFRA, that enjoined DCFEMS from enforcing the Policy against individuals who maintained beards for religious reasons.

369.    This Policy constitutes a violation of 42 U.S.C. § 12101, *et seq*.

370.    By depriving Mr. Kennedy of his rights, privileges, and immunities under of 42 U.S.C. § 12101, *et seq.*, the Policy is a violation of 42 U.S.C. 1983, *et seq.*

371.    This Policy was enforced with malice, with an evil mind, and with reckless indifference to Mr. Kennedy's federally protected rights.

372.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 7: FAILURE TO ACCOMMODATE IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

373.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-372 as if stated herein.

374.     Under the ADA, it is unlawful for an employer to discriminate against an employee on the basis of disability by failing to accommodate his disability.

375.     Mr. Kennedy is a qualified individual with a disability, he requested a reasonable accommodation, and Defendant failed to provide reasonable accommodation.

376.     Defendant willfully and intentionally, through actions and inactions, discriminated against Plaintiff because of his known physical condition, by failing to accommodate his medical restriction and instead ordering him to be clean shaven, and by subjecting him to discipline when he was not accommodated.

377.     Accommodating Mr. Kennedy would not have imposed an undue hardship on Defendant, as demonstrated by the fact that Defendant was allowing firefighters to maintain beards for religious reasons.

378.     Defendant engaged in its discriminatory actions with malice, with an evil mind, and with reckless indifference to Plaintiff's federally protected rights.

379.     Defendant's failure to accommodate Mr. Kennedy constitutes a violation of 42 U.S.C. § 12101, *et seq.*

380.     These acts were taken with malice or reckless indifference to Mr. Kennedy's rights under the ADA.

381.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 8: FAILURE TO ACCOMMODATE IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AMENDMENTS ACT

382.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-381 as if stated herein.

383.     Under the ADAAA, it is unlawful for an employer to discriminate against an employee on the basis of disability by failing to accommodate his disability.

384.     Mr. Kennedy is a qualified individual with a disability, he requested a reasonable accommodation, and Defendant failed to provide reasonable accommodation.

385.     Defendant willfully and intentionally, through actions and inactions, discriminated against Plaintiff because of his known physical condition, by failing to accommodate his medical restriction and instead ordering him to be clean shaven, and by subjecting him to discipline when he was not accommodated.

386.     Accommodating Mr. Kennedy would not have imposed an undue hardship on Defendant, as demonstrated by the fact that Defendant was allowing firefighters to maintain beards for religious reasons.

387.     Defendant's failure to accommodate Mr. Kennedy constitutes a violation of 42 U.S.C. § 12101, *et seq.*

388.     These acts were taken with malice or reckless indifference to Mr. Kennedy's rights under the ADAAA.

389.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

**COUNT 9: FAILURE TO ACCOMMODATE IN VIOLATION OF SECTION 1983 OF THE CIVIL RIGHTS ACT OF 1871**

390.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-389 as if stated herein.

391.     Under section 1983 of the Civil Rights Act of 1871 it is an unlawful employment practice for the District of Columbia to subject, or cause to subject, a citizen to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

392.     Under the ADA and ADAAA, it is unlawful for an employer to discriminate against an employee on the basis of disability by failing to accommodate his disability.

393.     Mr. Kennedy is a qualified individual with a disability, he requested a reasonable accommodation, and Defendant failed to provide reasonable accommodation.

394.     Under its Policy, Defendant willfully and intentionally, through actions and inactions, discriminated against Plaintiff because of his known physical condition, by failing to accommodate his medical restriction and instead ordering him to be clean shaven, and by subjecting him to discipline when he was not accommodated.

395.     Defendant used its Policy to justify denying Mr. Kennedy's accommodation.

396.     Accommodating Mr. Kennedy would not have imposed an undue hardship on

Defendant, as demonstrated by the fact that Defendant was allowing firefighters to

maintain beards for religious reasons.

397.     Defendant's failure to accommodate Mr. Kennedy under its Policy constitutes a

violation of 42 U.S.C. § 12101, *et seq.*

398.     By depriving Mr. Kennedy of his rights, privileges, and immunities under 42

U.S.C. § 12101, *et seq.*, Defendant's failure to accommodate Mr. Kennedy under its

Policy is a violation of 42 U.S.C. 1983, *et seq.*

399.     These acts were taken with malice, with an evil mind, and with reckless

indifference to Mr. Kennedy's federally protected rights.

400.     As the direct and proximate result of the acts and omissions of Defendant, as

described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings,

mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and

humiliation.

## COUNT 10: FAILURE TO ACCOMMODATE IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT OF 1977

401.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-400 as if

stated herein.

402.     Under District of Columbia Human Rights Act, D.C. Code § 2.1401 *et seq.*

("DCHRA"), it is unlawful for an employer to discriminate against an employee on the

basis of disability by failing to accommodate his disability.

403.     Mr. Kennedy is a qualified individual with a disability, he requested a reasonable

accommodation, and Defendant failed to provide reasonable accommodation.

404.     Defendant willfully and intentionally, through actions and inactions, discriminated against Plaintiff because of his known physical condition, by failing to accommodate his medical restriction and instead ordering him to be clean shaven, and by subjecting him to discipline when he was not accommodated.

405.     Accommodating Mr. Kennedy would not have imposed an undue hardship on Defendant, as demonstrated by the fact that Defendant was allowing firefighters to maintain beards for religious reasons.

406.     Defendant's failure to accommodate Mr. Kennedy constitutes a violation of D.C. Code § 2.1401, *et seq.*

407.     Defendant engaged in its discriminatory actions with conduct and a state of mind evincing malice or its equivalent.

408.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 11: DISPARATE TREATMENT ON THE BASIS OF DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

409.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-408 as if stated herein.

410.     Under the ADA, it is unlawful for an employer to discriminate against a qualified individual on the basis of disability in regard to discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

411.     Mr. Kennedy was a qualified individual with a disability while employed by Defendant.

412.     Defendant suspended Mr. Kennedy on multiple occasions on the basis of his

known disability.

413.     Defendant placed Mr. Kennedy on light/limited duty status on the basis of his

known disability.

414.     Defendant forced Mr. Kennedy to take leave on the basis of his known disability.

415.     Defendant's actions in suspending Mr. Kennedy, placing him on limited/light

duty status, and forcing him to take leave constitute a violation of 42 U.S.C. § 12101, *et

seq.*

416.     These acts were taken with malice or reckless indifference to Mr. Kennedy's

rights under the ADA.

417.     As the direct and proximate result of the acts and omissions of Defendant, as

described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings,

mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and

humiliation.

**COUNT 12: DISPARATE TREATMENT ON THE BASIS OF DISABILITY IN
VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AMENDMENTS ACT**

418.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-417 as if

stated herein.

419.     Under the ADAAA, it is unlawful for an employer to discriminate against a

qualified individual on the basis of disability in regard to discharge of employees,

employee compensation, job training, and other terms, conditions, and privileges of

employment.

420.     Mr. Kennedy was a qualified individual with a disability while employed by

Defendant.

421.     Defendant suspended Mr. Kennedy on multiple occasions on the basis of his known disability.

422.     Defendant placed Mr. Kennedy on light/limited duty status on the basis of his known disability.

423.     Defendant forced Mr. Kennedy to take leave on the basis of his known disability.

424.     Defendant's actions in suspending Mr. Kennedy, placing him on limited/light duty status, and forcing him to take leave constitute a violation of 42 U.S.C. § 12101, *et seq.*

425.     These acts were taken with malice or reckless indifference to Mr. Kennedy's rights under the ADAAA.

426.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

**COUNT 13: DISPARATE TREATMENT ON THE BASIS OF DISABILITY IN VIOLATION OF SECTION 1983 OF THE CIVIL RIGHTS ACT OF 1871**

427.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-426 as if stated herein.

428.     Under section 1983 of the Civil Rights Act of 1871 it is an unlawful employment practice for the District of Columbia to subject, or cause to subject, a citizen to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

429.     Under the ADA and ADAAA, it is unlawful for an employer to discriminate against a qualified individual on the basis of disability in regard to discharge of

employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

430.     Mr. Kennedy was a qualified individual with a disability while employed by Defendant.

431.     Using its Policy to justify its actions, Defendant suspended Mr. Kennedy on multiple occasions on the basis of his known disability.

432.     Using its Policy to justify its actions, Defendant placed Mr. Kennedy on light/limited duty status on the basis of his known disability.

433.     Using its Policy to justify its actions, Defendant forced Mr. Kennedy to take leave on the basis of his known disability.

434.     Defendant's actions in suspending Mr. Kennedy, placing him on limited/light duty status, and forcing him to take leave constitute a violation of 42 U.S.C. § 12101, *et seq.*

435.     By depriving Mr. Kennedy of his rights, privileges, and immunities under of 42 U.S.C. § 12101, *et seq.*, Defendant's actions under its Policy are a violation of 42 U.S.C. 1983, *et seq.*

436.     These acts were taken with malice, with an evil mind, and with reckless indifference to Mr. Kennedy's federally protected rights.

437.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 14: DISPARATE TREATMENT ON THE BASIS OF DISABILITY IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT OF 1977

438.        Mr. Kennedy incorporates all the allegations contained in paragraphs 1-437 as if stated herein.

439.        Under the DCHRA, D.C. Code §§ 2.1401 *et seq.*, it is unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment on the basis of a disability.

440.        Mr. Kennedy was a qualified individual with a disability while employed by Defendant.

441.        Defendant suspended Mr. Kennedy on multiple occasions on the basis of his known disability.

442.        Defendant placed Mr. Kennedy on light/limited duty status on the basis of his known disability.

443.        Defendant forced Mr. Kennedy to take leave on the basis of his known disability.

444.        Defendant's actions in suspending Mr. Kennedy, placing him on limited/light duty status, and forcing him to take leave constitute a violation of D.C. Code §§ 2.1401 *et seq.*

445.        Defendant engaged in its discriminatory actions with conduct and a state of mind evincing malice or its equivalent.

446.        As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 15: RETALIATION FOR PROTECTED ACTIVITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

447.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-446 as if stated herein.

448.     Under ADA, it is an unlawful employment practice for an employer to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, any right granted or protected by the ADA.

449.     Requesting a reasonable accommodation constitutes the exercise of rights under the ADA.

450.     Mr. Kennedy exercised his rights under the ADA by requesting an accommodation for his PFB.

451.     Defendant was aware of Mr. Kennedy's requests for accommodation.

452.     Defendant brought charges against and suspended Mr. Kennedy on multiple occasions in retaliation for him exercising his rights under the ADA and requesting a reasonable accommodation.

453.     Defendant placed Mr. Kennedy on light/limited duty status in retaliation for him exercising his rights under the ADA and requesting a reasonable accommodation.

454.     Defendant forced Mr. Kennedy to take leave in retaliation for him exercising his rights under the ADA and requesting a reasonable accommodation.

455.     Defendant subjected Mr. Kennedy to medical inquiries and examinations in retaliation for him exercising his rights under the ADA and requesting a reasonable accommodation.

456.     Defendant recommended that Mr. Kennedy be considered for disability retirement in retaliation for him exercising his rights under the ADA and requesting a reasonable accommodation.

457.     Defendant's actions in bringing charges against and suspending Mr. Kennedy, placing him on limited/light duty status, forcing him to take leave, subjecting him to medical inquiries and examinations, and recommending him for disability retirement constitute a violation of 42 U.S.C. § 12101, *et seq.*

458.     These acts were taken with malice or reckless indifference to Mr. Kennedy's rights under the ADA.

459.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 16: RETALIATION FOR PROTECTED ACTIVITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AMENDMENTS ACT

460.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-459 as if stated herein.

461.     Under ADAAA, it is an unlawful employment practice for an employer to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, any right granted or protected by the ADAAA.

462.     Requesting a reasonable accommodation constitutes the exercise of rights under the ADAAA.

463.     Mr. Kennedy exercised his rights under the ADAAA by requesting an accommodation for his PFB.

464.     Defendant was aware of Mr. Kennedy's requests for accommodation.

465.     Defendant brought charges against and suspended Mr. Kennedy on multiple occasions in retaliation for him exercising his rights under the ADAAA and requesting a reasonable accommodation.

466.     Defendant placed Mr. Kennedy on light/limited duty status in retaliation for him exercising his rights under the ADAAA and requesting a reasonable accommodation.

467.     Defendant forced Mr. Kennedy to take leave in retaliation for him exercising his rights under the ADAAA and requesting a reasonable accommodation.

468.     Defendant subjected Mr. Kennedy to medical inquiries and examinations in retaliation for him exercising his rights under the ADAAA and requesting a reasonable accommodation.

469.     Defendant recommended that Mr. Kennedy be considered for disability retirement in retaliation for him exercising his rights under the ADAAA and requesting a reasonable accommodation.

470.     Defendant's actions in bringing charges against and suspending Mr. Kennedy, placing him on limited/light duty status, forcing him to take leave, subjecting him to medical inquiries and examinations, and recommending him for disability retirement constitute a violation of 42 U.S.C. § 12101, *et seq.*

471.     These acts were taken with malice or reckless indifference to Mr. Kennedy's rights under the ADAAA.

472.     As the direct and proximate result of the acts and omissions of Defendant, as

described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings,

mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and

humiliation.

## COUNT 17: RETALIATION FOR PROTECTED ACTIVITY IN VIOLATION OF SECTION 1983 OF THE CIVIL RIGHTS ACT OF 1871

473.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-472 as if

stated herein.

474.     Under section 1983 of the Civil Rights Act of 1871 it is an unlawful employment

practice for the District of Columbia to subject, or cause to subject, a citizen to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

475.     Under the ADA and ADAAA, it is unlawful for an employer to coerce,

intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or

on account of his or her having exercised or enjoyed, any right granted or protected by

the ADA and ADAAA.

476.     Requesting a reasonable accommodation constitutes the exercise of rights under

the ADA and ADAAA.

477.     Mr. Kennedy exercised his rights under the ADA and ADAAA by requesting an

accommodation for his PFB.

478.     Defendant was aware of Mr. Kennedy's requests for accommodation.

479.     Using its Policy to justify its actions, Defendant brought charges against and

suspended Mr. Kennedy on multiple occasions in retaliation for him exercising his rights

under the ADA and ADAAA and requesting a reasonable accommodation.

480.     Using its Policy to justify its actions, Defendant placed Mr. Kennedy on light/limited duty status in retaliation for him exercising his rights under the ADA and ADAAA and requesting a reasonable accommodation.

481.     Using its Policy to justify its actions, Defendant forced Mr. Kennedy to take leave in retaliation for him exercising his rights under the ADA and ADAAA and requesting a reasonable accommodation

482.     Using its Policy to justify its actions, Defendant subjected Mr. Kennedy to medical inquiries and examinations in retaliation for him exercising his rights under the ADA and ADAAA and requesting a reasonable accommodation.

483.     Using its Policy to justify its actions, Defendant recommended that Mr. Kennedy be considered for disability retirement in retaliation for him exercising his rights under the ADA and ADAAA and requesting a reasonable accommodation.

484.     Defendant's actions in bringing charges against and suspending Mr. Kennedy, placing him on limited/light duty status, forcing him to take leave, subjecting him to medical inquiries and examinations, and recommending him for disability retirement constitute a violation of 42 U.S.C. § 12101, *et seq.*

485.     By depriving Mr. Kennedy of his rights, privileges, and immunities under 42 U.S.C. § 12101, *et seq.*, Defendant's actions taken under its Policy are a violation of 42 U.S.C. 1983, *et seq.*

486.     These acts taken under Defendant's Policy were taken with malice, with an evil mind, and with reckless indifference to Mr. Kennedy's federally protected rights.

487.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings,

mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 18: RETALIATION FOR PROTECTED ACTIVITY IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT OF 1977

488.    Mr. Kennedy incorporates all the allegations contained in paragraphs 1-487 as if stated herein.

489.    Under the DCHRA, D.C. Code § 2.1402 *et seq.* it is unlawful for an employer to retaliate against any individual on account of having exercised any right protected under the DCHRA or because that person has opposed any practice made unlawful by the DCHRA.

490.    Requesting a reasonable accommodation constitutes the exercise of rights under the DCHRA.

491.    Mr. Kennedy exercised his rights under the DCHRA by requesting an accommodation for his PFB.

492.    Defendant was aware of Mr. Kennedy's requests for accommodation.

493.    Defendant brought charges against and suspended Mr. Kennedy on multiple occasions in retaliation for him exercising his rights under the DCHRA and requesting a reasonable accommodation.

494.    Defendant placed Mr. Kennedy on light/limited duty status in retaliation for him exercising his rights under the DCHRA and requesting a reasonable accommodation.

495.    Defendant subjected Mr. Kennedy to medical inquiries and examinations in retaliation for him exercising his rights under the DCHRA and requesting a reasonable accommodation.

496.     Defendant forced Mr. Kennedy to take leave in retaliation for him exercising his rights under the DCHRA and requesting a reasonable accommodation.

497.     Defendant recommended that Mr. Kennedy be considered for disability retirement in retaliation for him exercising his rights under the DCHRA and requesting a reasonable accommodation.

498.     Defendant's actions in bringing charges against and suspending Mr. Kennedy, placing him on limited/light duty status, forcing him to take leave, subjecting him to medical inquiries and examinations, and recommending him for disability retirement constitute a violation of the DCHRA.

499.     Defendant engaged in its retaliatory actions with conduct and a state of mind evincing malice or its equivalent.

500.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 19: RETALIATION FOR PROTECTED ACTIVITY IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

501.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-500 as if stated herein.

502.     Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, it is unlawful for an employer to discriminate against an individual because he has engaged in protected activity by opposing any employment practice made unlawful by Title VII or by filing a charge under Title VII.

503.     Mr. Kennedy engaged in protected activity when he opposed Defendant's

discriminatory treatment of him beginning in 2008.

504.     Mr. Kennedy also engaged in protected activity when he filed a charge of

discrimination with the EEOC on or around July 31, 2008.

505.     Defendant was aware of Mr. Kennedy's protected activity.

506.     Defendant brought charges against and suspended Mr. Kennedy on multiple

occasions in retaliation for him engaging in protected activity.

507.     Defendant placed Mr. Kennedy on light/limited duty status in retaliation for him

engaging in protected activity.

508.     Defendant forced Mr. Kennedy to take leave in retaliation for him engaging in

protected activity.

509.     Defendant subjected Mr. Kennedy to medical inquiries and examinations in

retaliation for him engaging in protected activity.

510.     Defendant recommended that Mr. Kennedy be considered for disability retirement

in retaliation for him engaging in protected activity.

511.     Defendant's actions in bringing charges against and suspending Mr. Kennedy,

placing him on limited/light duty status, forcing him to take leave, subjecting him to

medical inquiries and examinations, and recommending him for disability retirement

constitute a violation of 42 U.S.C. § 2000e, *et seq.*

512.     These acts were taken with malice or reckless indifference to Mr. Kennedy's

rights under Title VII of the Civil Rights Act of 1964.

513.     As the direct and proximate result of the acts and omissions of Defendant, as

described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings,

mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and

humiliation.

## COUNT 20: RETALIATION FOR PROTECTED ACTIVITY IN VIOLATION OF SECTION 1983 OF THE CIVIL RIGHTS ACT OF 1871

514.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-513 as if

stated herein.

515.     Under section 1983 of the Civil Rights Act of 1871 it is an unlawful employment

practice for the District of Columbia to subject, or cause to subject, a citizen to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

516.     Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, it is

unlawful for an employer to discriminate against an individual because he has engaged in

protected activity by opposing any employment practice made unlawful by Title VII or

by filing a charge under Title VII.

517.     Mr. Kennedy engaged in protected activity when he opposed Defendant's

discriminatory treatment of him beginning in 2008.

518.     Mr. Kennedy also engaged in protected activity when he filed a charge of

discrimination with the EEOC on or around July 31, 2008.

519.     Defendant was aware of Mr. Kennedy's protected activity.

520.     Using its Policy to justify its actions, Defendant brought charges against and

suspended Mr. Kennedy on multiple occasions in retaliation for him engaging in

protected activity.

521.     Using its Policy to justify its actions, Defendant placed Mr. Kennedy on

light/limited duty status in retaliation for him engaging in protected activity.

522.     Using its Policy to justify its action, Defendant forced Mr. Kennedy to take leave in retaliation for him engaging in protected activity.

523.     Using its Policy to justify its actions, Defendant subjected Mr. Kennedy to medical inquiries and examinations in retaliation for him engaging in protected activity.

524.     Using its Policy to justify its actions, Defendant recommended that Mr. Kennedy be considered for disability retirement in retaliation for him engaging in protected activity.

525.     Defendant's actions taken under its Policy in bringing charges against and suspending Mr. Kennedy, placing him on limited/light duty status, forcing him to take leave, subjecting him to medical inquiries and examinations, and recommending him for disability retirement constitute a violation of 42 U.S.C. § 2000e, *et seq.*

526.     By depriving Mr. Kennedy of his rights, privileges, and immunities under 42 U.S.C. § 2000e, *et seq.* Defendant's actions taken under its Policy are a violation of 42 U.S.C. 1983, *et seq.*

527.     These acts were taken with malice, with an evil mind, and with reckless indifference to Mr. Kennedy's federally protected rights.

528.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

**COUNT 21:  RETALIATION FOR PROTECTED ACTIVITY IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT OF 1977**

529.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-528 as if stated herein.

530.     Under the DCHRA, D.C. Code § 2.1402 *et seq.* it is unlawful for an employer to retaliate against any individual on account of having exercised any right protected under the DCHRA or because that person has opposed any practice made unlawful by the DCHRA.

531.     Mr. Kennedy engaged in protected activity when he opposed Defendant's discriminatory treatment of him beginning in 2008

532.     Mr. Kennedy exercised his rights under the DCHRA when he filed a charge of discrimination on or around July 31, 2008.

533.     Mr. Kennedy again exercised his rights under the DCHRA each time he requested reasonable accommodation.

534.     Defendant was aware of each instance on which Mr. Kennedy exercised his rights under the DCHRA and opposed practices made unlawful by the DCHRA.

535.     Defendant brought charges against and suspended Mr. Kennedy on multiple occasions in retaliation for him exercising his rights under the DCHRA and opposing practices made unlawful by the DCHRA.

536.     Defendant placed Mr. Kennedy on light/limited duty status in retaliation for him exercising his rights under the DCHRA and opposing practices made unlawful by the DCHRA.

537.     Defendant forced Mr. Kennedy to take leave in retaliation for him exercising his rights under the DCHRA and opposing practices made unlawful by the DCHRA.

538.     Defendant subjected Mr. Kennedy to medical inquiries and examinations in retaliation for him exercising his rights under the DCHRA and opposing practices made unlawful by the DCHRA.

539.     Defendant recommended that Mr. Kennedy be considered for disability retirement in retaliation for him exercising his rights under the DCHRA and opposing practices made unlawful by the DCHRA.

540.     Defendant's actions in bringing charges against and suspending Mr. Kennedy, placing him on limited/light duty, forcing him to take leave, subjecting him to medical inquiries and examinations, and recommending him for disability retirement constitute a violation of D.C. Code § 2.1402 *et seq.*

541.     Defendant engaged in its retaliatory actions with conduct and a state of mind evincing malice or its equivalent.

542.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 22: DISPARATE IMPACT ON THE BASIS OF DISABILITY IN VIOLATION OF THE REHABILITATION ACT

543.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-542 as if stated herein.

544.     The Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, incorporates and operates with the same protections and standards outlined in the ADA and ADAAA.

545.     Under the Rehabilitation Act, it is unlawful for employers who received federal funds to subject its employees to a policy that screens out or tends to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

546.      Defendant receives federal funds.

547.      As a result of DCFEMS's Policy that calls for discipline of firefighters who are not clean shaven, individuals who cannot shave because of PFB are disciplined.

548.      PFB is a medical condition that impacts cell growth and ability to shave.

549.      PFB qualifies as a disability under 29 U.S.C. § 701 *et seq.*

550.      The Policy has a disparate, adverse impact on individuals suffering from PFB.

551.      The Policy is not job related.

552.      The Policy is not consistent with business necessity.

553.      Alternative policies with lesser impact exist.

554.      At all times relevant to the complaint, DCFEMS was aware of previous injunctions, based on the RFRA, that enjoined DCFEMS from enforcing the Policy against individuals who maintained beards for religious reasons.

555.      This Policy constitutes a violation of 29 U.S.C. § 701 *et seq.*

556.      This Policy was enforced with malice or reckless indifference to Mr. Kennedy's rights under the Rehabilitation Act.

557.      As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 23: FAILURE TO ACCOMMODATE IN VIOLATION OF THE REHABILITATION ACT

558.      Mr. Kennedy incorporates all the allegations contained in paragraphs 1-557 as if stated herein.

559.     The Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, incorporates and operates with the same protections and standards outlined in the ADA and ADAAA.

560.     Under the Rehabilitation Act, it is unlawful for an employer who receives federal funds to discriminate against an employee on the basis of disability by failing to accommodate his disability.

561.     Defendant receives federal funds.

562.     Mr. Kennedy is a qualified individual with a disability, he requested a reasonable accommodation, and Defendant failed to provide reasonable accommodation.

563.     Defendant willfully and intentionally, through actions and inactions, discriminated against Plaintiff because of his known physical condition, by failing to accommodate his medical restriction and instead ordering him to be clean shaven, and by subjecting him to discipline when he was not accommodated.

564.     Defendant's failure to accommodate Mr. Kennedy constitutes a violation of 29 U.S.C. § 701, *et seq.*

565.     These acts were taken with malice or reckless indifference to Mr. Kennedy's rights under the Rehabilitation Act.

566.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

**COUNT 24: DISPARATE TREATMENT ON THE BASIS OF DISABILITY IN
VIOLATION OF THE REHABILITATION ACT**

567.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-566 as if stated herein.

568.     The Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, incorporates and operates with the same protections and standards outlined in the ADA and ADAAA.

569.     Under the Rehabilitation Act, it is unlawful for an employer who receives federal funds to discriminate against a qualified individual on the basis of disability in regard to discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

570.     Defendant receives federal funds.

571.     Mr. Kennedy was a qualified individual with a disability while employed by Defendant.

572.     Defendant suspended Mr. Kennedy on multiple occasions on the basis of his known disability.

573.     Defendant placed Mr. Kennedy on light/limited duty status on the basis of his known disability.

574.     Defendant forced Mr. Kennedy to take leave on the basis of his known disability.

575.     Defendant's actions in suspending Mr. Kennedy, placing him on limited/light duty status, and forcing him to take leave constitute a violation of 29 U.S.C. § 701, *et seq.*

576.     These acts were taken with malice or reckless indifference to Mr. Kennedy's rights under the Rehabilitation Act.

577.     As the direct and proximate result of the acts and omissions of Defendant as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## COUNT 25: RETALIATION FOR PROTECTED ACTIVITY IN VIOLATION OF THE REHABILITATION ACT

578.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-577 as if stated herein.

579.     The Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, incorporates and operates with the same protections and standards outlined in the ADA and ADAAA.

580.     Under The Rehabilitation Act, it is an unlawful employment practice for an employer who receives federal funds to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, any right granted or protected by the Rehabilitation Act.

581.     Defendant receives federal funds.

582.     Requesting a reasonable accommodation constitutes the exercise of rights under the Rehabilitation Act.

583.     Mr. Kennedy exercised his rights under the Rehabilitation Act by requesting an accommodation for his PFB.

584.     Defendant was aware of Mr. Kennedy's requests for accommodation.

585.     Defendant brought charges against and suspended Mr. Kennedy on multiple occasions in retaliation for him exercising his rights under the Rehabilitation and requesting a reasonable accommodation.

586.     Defendant placed Mr. Kennedy on light/limited duty status in retaliation for him exercising his rights under the Rehabilitation Act and requesting a reasonable accommodation.

587.     Defendant forced Mr. Kennedy to take leave in retaliation for him exercising his rights under the Rehabilitation Act and requesting a reasonable accommodation.

588.     Defendant subjected Mr. Kennedy to medical inquiries and examinations in retaliation for him exercising his rights under the Rehabilitation Act and requesting a reasonable accommodation.

589.     Defendant recommended that Mr. Kennedy be considered for disability retirement in retaliation for him exercising his rights under the Rehabilitation Act and requesting a reasonable accommodation.

590.     Defendant's actions in bringing charges against and suspending Mr. Kennedy, placing him on limited/light duty status, subjecting him to medical inquiries and examinations, and recommending him for disability retirement constitute a violation of 29 U.S.C. § 701, *et seq.*

591.     These acts were taken with malice or reckless indifference to Mr. Kennedy's rights under the Rehabilitation Act.

592.     As the direct and proximate result of the acts and omissions of Defendant as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

### COUNT 26: IMPROPER MEDICAL INQUIRIES AND EXAMINATIONS IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

593.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-592 as if stated herein.

594.     Under the ADA it is unlawful for an employer to make disability related inquiries and medical examinations of employees that are not job-related and consistent with business necessity.

595.     Defendant subjected Mr. Kennedy to medical inquiries and examinations that were not job-related or consistent with business necessity.

596.     Defendant's actions in subjecting Mr. Kennedy to improper medical inquiries and examinations constitute a violation of 42 U.S.C. § 12101, *et seq.*

597.     These acts were taken with malice or reckless indifference to Mr. Kennedy's rights under the ADA.

598.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

### COUNT 27: IMPROPER MEDICAL INQUIRIES AND EXAMINATIONS IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AMENDMENTS ACT

599.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-598 as if stated herein.

600.     Under the ADAAA it is unlawful for an employer to make disability related inquiries and medical examinations of employees that are not job-related and consistent with business necessity.

601.     Defendant subjected Mr. Kennedy to medical inquiries and examinations that were not job-related or consistent with business necessity.

602.     Defendant's actions in subjecting Mr. Kennedy to improper medical inquiries and examinations constitute a violation of 42 U.S.C. § 12101, *et seq.*

603.     These acts were taken with malice or reckless indifference to Mr. Kennedy's rights under the ADAAA.

604.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

**COUNT 28: IMPROPER MEDICAL INQUIRIES AND EXAMINATIONS IN VIOLATION OF THE REHABILITATION ACT**

605.     Mr. Kennedy incorporates all the allegations contained in paragraphs 1-604 as if stated herein.

606.     The Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, incorporates and operates with the same protections and standards outlined in the ADA and ADAAA.

607.     Under the Rehabilitation Act it is unlawful for an employer who receives federal funds to make disability related inquiries and medical examinations of employees that are not job-related and consistent with business necessity.

608.     Defendant receives federal funds.

609.     Defendant subjected Mr. Kennedy to medical inquiries and examinations that were not job-related or consistent with business necessity.

610.     Defendant's actions in subjecting Mr. Kennedy to improper medical inquiries and examinations constitute a violation of 29 U.S.C. § 701 *et seq.*

611.     These acts were taken with malice or reckless indifference to Mr. Kennedy's rights under the Rehabilitation Act.

612.     As the direct and proximate result of the acts and omissions of Defendant, as described above, Mr. Kennedy suffered loss of pay and benefits, lost interest on earnings, mental anguish, anxiety, depression, stress, loss of enjoyment of life, inconvenience, and humiliation.

## PRAYER FOR RELIEF

**WHEREFORE,** Mr. Kennedy prays this Court to:

a.  Grant judgment in his favor against Defendant.

b.  Grant him declaratory relief, such as declaring that enforcing the Policy despite medical documentation regarding PFB and evidence of efficacy of the mask with a beard, is unlawful and discriminatory.

c.  Grant injunctive relief, such as enjoining DCFEMS from enforcing the Policy.

d.  Award Mr. Kennedy back pay, compensate him for lost benefits, and otherwise make him whole in an amount to be shown at trial;

e.  Award him compensatory damages in an amount to be shown at trial;

f.  Award him reimbursement of the attorneys' fees and costs he has expended in litigating this matter; and

g.  Grant him such other and further relief as justice may require.

## JURY DEMAND

Mr. Kennedy hereby demands a trial by jury on all claims so triable.

**DATED: September 11, 2013**          Respectfully Submitted,

/s/ Ari M. Wilkenfeld_____
Ari M. Wilkenfeld (Bar. No. 461063)

/s/ Shannon C. Leary_____
Shannon C. Leary (Bar. No. MD18396)
Attorneys for Plaintiff
The Law Offices of Gary M. Gilbert and Associates
1100 Wayne Ave., Suite 900
Silver Spring, MD 20910
Telephone: 301-608-0880
Facsimile: 301-608-0881
sleary@ggilbertlaw.com
awilkenfeld@ggilbertlaw.com